NIPPON STEEL CORP., KAWASAKI STEEL CORP., KOBÉ STEEL, LTD., NISSHIN STEEL CO., LTD., NKK CORP., AND SUMITOMO METAL INDUSTRIES, LTD., ET AL., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND U.S. STEEL GROUP—A UNIT OF USX CORP., AK STEEL CORP., GULF STATES STEEL, INC. OF ALABAMA, NATIONAL STEEL CORP., BETHLEHEM STEEL CORP., LTV STEEL CO., INC., INLAND STEEL INDUSTRIES, INC., SHARON STEEL CORP., AND WCI STEEL, INC., DEFENDANT-INTERVENORS

Consolidated Court No. 93-09-00555-INJ

(Dated April 3, 1995)

*Steptoe & Johnson (Daniel J. Plaine, Edward J. Krauland, Anthony J. LaRocca, Gracia M. Berg* and *Karen Kuhlke)* for plaintiffs Nippon Steel Corporation; Kawasaki Steel Corporation; Kobé Steel, Ltd.; Nisshin Steel Co., Ltd.; NKK Corp. and Sumitomo Metal Industries, Ltd.

*Dickstein, Shapiro & Morin, L.L.P. (Arthur J. LaFave III* and *Douglas N. Jacobson)* for plaintiff Companhia Siderúrgica Nacional S.A.

*Morrison & Foerster (Donald B. Cameron* and *Julie C. Mendoza)* for plaintiffs Dongbu Steel Co., Ltd.; Pohang Coated Steel Co., Ltd.; Pohang Steel Industries Co., Ltd.; Pohang Iron & Steel Co., Ltd.; and Union Steel Manufacturing Co., Ltd.

*O'Melveny & Myers (Kermit W. Almstedt* and *Greta L.H. Lichtenbaum)* for plaintiff Broken Hill Proprietary Co., Ltd., *(Craig L. McKee)* for plaintiff BHP New Zealand Steel Ltd.

*Weil, Gotshal & Manges (Jeffrey P. Bialos, Angela J. Paolini Ellard, Martin S. Applebaum* and *Gregory Husisian)* for plaintiffs Usinor Sacilor and Sollac.

*White & Case (Walter J. Spak, Vincent Bowen* and *Christopher M. Curran)* for plaintiff Industrias Monterrey, S.A. de C.V.

*Winthrop, Stimson, Putnam & Roberts (Louis H. Kurrelmeyer, Mark A. Monborne* and *David S. Christy, Jr.)* for plaintiff SSAB Svenskt Stål AB.

*Lyn M. Schlitt,* General Counsel, United States International Trade Commission, *James A. Toupin,* Deputy General Counsel *(Cynthia P. Johnson, Scott D. Andersen* and *James M. Lyons)* for defendant.

*Dewey Ballantine (Alan Wm. Wolff, Michael H. Stein, Joseph A. Black* and *Linda C. Menghetti)* and *Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan* and *Stephen Narkin)* for defendant-intervenors U.S. Steel Group—a Unit of USX Corp.; AK Steel Corp.; Gulf States Steel, Inc. of Alabama; National Steel Corp.; Bethlehem Steel Corp.; LTV Steel Company, Inc.; Inland Steel Industries, Inc.; Sharon Steel Corp.; and WCI Steel, Inc.

## OPINION

RESTANI, *Judge:* This matter is before the court on parties' cross-motions for judgment upon the agency record, challenging the affirmative material injury determination by the United States International Trade Commission ("ITC" or "Commission") with respect to certain corrosion-resistant steel products from Australia, Canada, France, Germany, Japan and Korea that were found to be subsidized or sold at less than fair value ("LTFV"). *Certain Flat-Rolled Carbon Steel Prods. from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* USITC Pub. No. 2664, Inv. Nos. 701–TA–319–332, 334, 336–342, 344, and

347–353, and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609, and 612–619 (Aug. 1993) (final determ.) *("Final Det.");* 58 Fed. Reg. 43,905 (USITC 1993). In that determination, a majority of the ITC Commissioners[1] further found that a United States industry was not materially injured or threatened with material injury by reason of LTFV or subsidized sales of corrosion-resistant steel imports from Brazil, Mexico, New Zealand and Sweden.[2] *Final Det.* at 161; 58 Fed. Reg. at 43,906. The majority also determined that the domestic industry producing corrosion-resistant clad plate steel was not materially injured or threatened with material injury by reason of LTFV or subsidized imports from France and Japan. *Final Det.* at 161; 58 Fed. Reg. at 43,907 n.1.

## I. FACTS

Defendant-intervenors U.S. Steel Group, AK Steel Corp., Gulf States Steel Inc. of Alabama, National Steel Corp., Bethlehem Steel Corp., LTV Steel Company, Inc., Inland Steel Industries, Inc., Sharon Steel Corp., and WCI Steel, Inc. (collectively "petitioners") are U.S. manufacturers of corrosion-resistant steel products. Corrosion-resistant steel is employed mostly in the automotive, construction and appliance industries. U.S. Int'l Trade Comm., *Certain Flat-Rolled Carbon-Steel Products: Final Report to the Commission* at I–36 (1993) ("Pub. Staff Rpt."). Corrosion-resistant products are flat-rolled steel products coated with metals or non-metallic substances to improve their appearance aesthetically, to reduce final product cost, and to improve corrosion resistance. *Id.* at I–32–I–33. These products are either clad, plated or coated with metals such as zinc, aluminum, or alloys of zinc, aluminum, nickel or iron. *Id.* at I–26.

## A. PARTIES' CONTENTIONS

On June 30, 1992 petitioners filed with the Commission and the International Trade Administration of the United States Department of Commerce ("Commerce") petitions alleging that the domestic steel industry was materially injured or threatened with material injury by reason of subsidized and/or LTFV imports. In August 1992, the Commission made preliminary determinations, finding there existed a reasonable indication that the domestic industry producing corrosion-resistant steel was materially injured or threatened with material injury by reason of the subject imports. The Commission published the final results of its investigations on August 18, 1993.

---

[1] At the time of issuance of the final determination, the Commission consisted of Chairman Newquist, Vice Chairman Watson, and Commissioners Rohr, Brunsdale, Crawford and Nuzum. For ease of reference, and because the titles of some of the Commissioners have since changed, each of the members of the Commission will be referred to by the title "Commissioner" throughout the opinion.

[2] All Commissioners joined portions of the majority determination. Commissioner Newquist joined only the discussions of like product, domestic industry and condition of the domestic industry. Commissioner Watson joined the discussion of all portions of the majority determination. Commissioner Rohr joined all portions of the majority determination except the negligibility analysis for France and Mexico, and discussions of threat as to imports from Mexico. Commissioner Brunsdale joined only the discussions of like product, domestic industry, related parties, cumulation (except the negligibility analysis of imports from France), and threat. Commissioner Nuzum joined all portions of the determination except the negligibility analyses for Brazil, Mexico, New Zealand, South Africa and Sweden, and the threat analyses for Brazil, Mexico, New Zealand and Sweden. Commissioner Crawford joined the majority determination except for the discussion of price effects. *Final Det.* at 161 n.1, 189 n.227, 335–36.

Motions for judgment upon the agency record pursuant to USCIT Rule 56.2 have been filed by (1) Broken Hill Proprietary Co., Ltd. ("BHP"); (2) Usinor Sacilor and Sollac (collectively "Usinor"), (3) Nippon Steel Corporation; Kawasaki Steel Corporation; Kobé Steel, Ltd.; Nisshin Steel Co., Ltd., NKK Corp.; Sumitomo Metal Industries, Ltd.; Dongbu Steel Co., Ltd.; Pohang Coated Steel Co., Ltd.; Pohang Steel Industries Co., Ltd.; Pohang Iron & Steel Co., Ltd.; Union Steel Manufacturing Co., Ltd.; Usinor Sacilor; Sollac; and Broken Hill Proprietary Co., Ltd. (collectively "respondents"); and (4) petitioners, contesting portions of the determination. BHP challenges the Commission's like product determination, contending that its product should have been found to be a separate like product from all other corrosion-resistant steel. Usinor argues in its motion that the Commission improperly applied the negligibility exception to cumulation to imports from France. Respondents jointly contend that the Commission erred in assessing volume and price effects in its material injury analysis, in view of conditions of competition, and that its findings as to volume and price effects were not supported by the record. Respondents further contend that the majority and Commissioner Newquist, in particular, incorrectly concluded that imports impaired the ability of the domestic industry to raise capital. Defendant and petitioners oppose these motions.

Petitioners challenge the majority's application of the negligibility exception to cumulation for imports from Brazil, Mexico, New Zealand and Sweden. Petitioners also contest the negative threat of material injury determinations for imports from Brazil and Mexico. Both defendant and respondents oppose petitioners' challenges.

### B. ITC's Determination

The Commission found by a vote of 5–1 that imports from Australia, Canada, Germany, Japan and Korea caused material injury.[3] By a vote of 4–2, the majority determined that imports from France caused material injury. A majority of the commissioners found imports from Brazil, Mexico, New Zealand and Sweden did not cause or threaten material injury.

The Commission found that during the period of investigation domestic consumption of corrosion-resistant products increased overall. *Final Det.* at 169; Pub. Staff Rpt. at I–149 tbl. 107. The domestic industry's market share declined throughout the period, from 85.6 percent in 1990 to 82.7 percent in 1992. *Final Det.* at 169–70; Pub. Staff Rpt. at I–149 tbl. 107. At the same time, the Commission found that the volumes of the cumulated subject imports increased substantially over the period of investigation, and corresponded to a significant increase in market share. *Final Det.* at 188.

The Commission found a reasonable overlap of competition between imports and the domestic product, noting that each of the ten importing

---

[3] Commissioner Newquist determined that the domestic industry was not experiencing present injury, and that there was a threat of material injury by reason of imports from Australia, Canada, Germany, Japan and Korea. *See Final Det.* at 306.

countries sold at least some of the same "commodity grade" and/or "niche" products as all other countries. *Id.* at 173. Regarding substitutability, the Commission examined imports from each country and determined not only that there existed few products for which there was no domestic production, but also that the volume of those few products constituted a minor percentage of total imports from the importing country. *See id.* at 172–86.

The Commission acknowledged that purchasers usually maintain a list of a few approved suppliers and do not switch suppliers from order to order on the basis of factors such as price. *Id.* at 169. The Commission noted that approximately half of the purchasers surveyed had not switched suppliers in the past five years. *Id.* While the Commission determined the domestic industry was relatively insensitive to price, *id.* at 189, it also found that price was not an unimportant factor in purchasing decisions. *Id.* at 190.

The Commission noted that in spite of relative price insensitivity, there were significant price effects by reason of the subject imports, although the Commission placed less weight on price effects than on volume effects. *Id.* at 189–90. The Commission found that: 1/ imports had a depressing or suppressing effect on domestic price for a majority of products, 2/ the presence of underselling was significant, particularly in the distributor/service center sector, and 3/ domestic producers were forced to discount from the prices of dumped and subsidized imports to compete for sales. *Id.* The Commission further noted that the existence of overselling was not determinative of whether cumulated imports were a cause of the decline or suppression/depression of domestic prices. *Id.* at 190.

In view of small and/or declining import volume and market share for imports from Brazil, Mexico, New Zealand, South Africa and Sweden, the Commission found that imports from each of these countries fell within the negligibility exception to cumulation. *Id.* at 181–86. In part on the basis of data demonstrating predominant overselling by imports from Mexico and New Zealand, the Commission found they had no significant effect on domestic price. *See id.* at 183–85. The Commission was also presented with information indicating the absence of lost sales evidence for New Zealand. Defendant's Appendix, vol. IV, at I–295 tbl. 117 *in U.S. Steel Group v. United States,* 873 F. Supp. 673 (Ct. Int'l Trade 1994) (Consol. Ct. No. 93–09–00564–INJ) ("Conf. Staff Rpt."); *see id.* at 184. Lost sales for Brazil and Sweden were found to involve small tonnages. *Final Det.* at 182, 186.

With regard to threat of material injury, the Commission exercised its discretion not to cumulate, and reached negative findings for Brazil, Mexico, New Zealand and Sweden. *Id.* at 195 & n.265. The majority determined that for Brazil, capacity was unchanged during the period. *Id.* at 195. The volume of Brazilian imports to the United States had declined and was small. *Id.* Although the Commission noted the start-up of a new facility in late 1993 by a company that was not then exporting to

the United States, the Commission found no evidence that this increase in capacity would result in a significant increase in exports to the United States. *Id.* Further, the Commission concluded there was no evidence of a rapid increase in U.S. market penetration, and no evidence to indicate a discernible adverse price impact. *Id.* Thus, the majority determined that Brazilian imports did not pose a threat of material injury in the imminent future. *Id.* at 196.

The Commission also found as to Mexican imports that capacity increased throughout the period, and capacity utilization declined. The Commission found, however, that exports to the United States fluctuated during the period, as did exports to other markets. *Id.* The Commission determined there was no persuasive evidence that increased capacity would result in increased volume to the United States and a corresponding adverse effect on price. *Id.* at 196–97. Market penetration in the United States by Mexican imports was found to be negligible and had not experienced any rapid increase. *Id.* The Commission further found that due to negligible volume, Mexican imports did not have a discernible adverse impact on domestic price. *Id.* at 197. In general, the Commission found a lack of evidence to warrant an affirmative threat finding for Mexico.

## II. STANDARD OF REVIEW

The scope of review of an ITC determination is whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). The court cannot substitute its judgment for that of the agency, nor may it reweigh the evidence. *R-M Indus., Inc. v. United States,* 848 F. Supp. 204, 207 (Ct. Int'l Trade 1994).

## III. DISCUSSION

To determine whether material injury has occurred because of LTFV or subsidized imports under investigation, ITC is required to consider the volume of imports, their effect and impact on domestic prices and production, and other relevant economic factors. *See* 19 U.S.C. § 1677(7)(B) (1988). To determine whether threat of material injury caused by LTFV or subsidized imports exists, ITC must review ten factors, including foreign production capacity, market penetration, price suppression or depression, inventories of subject merchandise, underutilized foreign production capacity, and actual or potential negative effects on the domestic industry's existing development and production efforts. *Id.* § 1677(7)(F)(i). The court will discuss each contention raised by the parties.

## A. LIKE PRODUCT

The statute defines "like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10) (1988). Selection of the bases upon which a like product determination is made is within the

Commission's discretion, and may depend upon the unique facts of each case. *See Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 638, 693 F. Supp. 1165, 1169 (1988). The Commission generally disregards minor differences, and looks for clear dividing lines between like products.[4] *See* S. Rep. No. 249, 96th Cong., 1st Sess. 90–91 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 476–77.

In its final determination, the majority[5] found corrosion-resistant steel to consist of two different like products: corrosion-resistant steel sheet excluding clad plate, and clad plate.[6] *See Final Det.* at 164–67. During the final investigations, respondents had asserted that aluminum-zinc coated sheet ("AlZn" or "Galvalume") was a separate like product for several reasons, including its distinct composition, the fact that AlZn was subject to a patent, and that knowledge of the production process involves licensed technology. The Commission determined that in spite of these differences as compared with other corrosion-resistant products, AlZn was not a separate like product, because it possessed similar physical characteristics, overlapping end uses, similar channels of distribution and similar production processes. *Final Det.* at 165. The Commission noted that although AlZn was previously subject to a patent and its production process technology is licensed, these factors were not sufficient to warrant a separate like product category, as these aspects demonstrated variables in the process rather than an entirely different production process. *Id.*

BHP argues that the Commission, in reaching its conclusion, ignored certain evidence and misconstrued BHP's earlier arguments. Specifically, BHP asserts that the Commission failed to evaluate evidence of different channels of distribution as shaped by the license agreements. BHP further contends that the Commission ignored evidence of lack of interchangeability, absence of overlap in end use, lack of fungibility, and differing physical characteristics. In addition, BHP argues that the evidence of the patents, license agreements and proprietary technology was offered to show that the AlZn production process was unique. Defendant and petitioners respond that the Commission considered all of the evidence presented.

---

[4] The ITC considers the following factors in its determination of like product: 1/ physical appearance, 2/ interchangeability, 3/ channels of distribution, 4/ customer perception, 5/ common manufacturing facilities and production employees, and where appropriate, 6/ price. *Torrington Co. v. United States,* 14 CIT 648, 652, 747 F. Supp. 744, 749 (1990).

[5] Commissioner Newquist defined the like product as consisting of corrosion-resistant steel products, including clad plate. *Final Det.* at 166 n.26. Commissioner Newquist found that clad plate was at the "high-end" of the continuum of corrosion-resistant products. *Id.*

[6] Commerce had previously identified corrosion-resistant flat rolled carbon steel as a separate "class or kind" of merchandise subject to investigation and defined it to include

flat-rolled carbon steel products, of rectangular shape, either clad, plated, or coated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished or coated with plastics or other nonmetallic substances in addition to the metallic coating, in coils (whether or not in successively superimposed layers) and of a width of 0.5 inch or greater, or in straight lengths which, if of a thickness less than 4.75 millimeters, are of a width of 0.5 inch or greater and which measures at least 10 times the thickness or if of a thickness of 4.75 millimeters or more are of a width which exceeds 150 millimeters and measures at least twice the thickness * * *. Excluded from these investigations are flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ('terne plate'), or both chromium and chromium oxides ('tin-free steel').

*Certain Cold-Rolled Carbon Steel Flat Products from Argentina,* 58 Fed. Reg. 37,062, 37,064 app. I (Dep't Comm. 1993) (final determ. of LTFV sales); *Final Det.* at 163.

1. *Channels of distribution and market segmentation:*

BHP contends that patent license agreements for AlZn created a segmentation of the market, with U.S. steel producers cultivating customers and a distribution network in the East, while BHP did the same in the West Coast market. BHP asserts that even after the expiration of the agreements in 1991, this segmentation remained. To support this assertion, BHP relies upon evidence that domestic AlZn was not available on the West Coast, freight costs to ship domestic AlZn to the West Coast were prohibitive, most of BHP's sales were on the West Coast, and domestic AlZn producers did not offer the product in the West except to their national accounts.

Both defendant and petitioners argue that the Commission traditionally analyzes the distributor/service center channel of distribution or manufacturer/end user channel, or both, and that AlZn sales data reflect similar channel-to-channel patterns as for other corrosion-resistant products.[7] *See* Conf. Staff Rpt. N–15 tbl. N–14, N–37 tbl. N–32, N–49 tbl. N–48, N–63 tbl. N–65; Pub. Staff Rpt. at I–47–I–48. Defendant also contends that AlZn is produced worldwide, including throughout the United States, by various foreign and domestic producers. Further, defendant notes that BHP's own evidence indicates that domestic producers sold AlZn on the West Coast to national accounts. *See* App. to Pl. BHP's Mot. J. Agency R., App. B, App. 1, at 3, ¶ 22 (Decl. of Herbert L. Harris).

Petitioners noted at oral argument that certain domestic mills shipped AlZn outside of a 500-mile radius, despite freight costs.[8] *See* Pub. Staff Rpt. at I–168; Tr. at 156. Evidence in the record demonstrates that small quantities of domestic AlZn were sold on the West Coast. *See* Pet'rs' Post-Oral Argument Subm., Exs. 8–9 (table of quantities purchased; excerpts from purchaser questionnaire responses). Further, petitioners stated that such freight costs for corrosion-resistant steel are nearly 10 percent of the total product cost, *id.*, an amount less than the dumping margin for Australia. *See Certain Corrosion-Resistant Carbon Steel Flat Prods. from Australia,* 58 Fed. Reg. 44,161, 44,161 (Dep't Comm. 1993). There appears to be some evidence that freight costs do not prevent domestic producers from competing in the West Coast market. More importantly, a geographically remote market in which competition is somewhat attenuated need not be found to be a separate "channel of distribution." Furthermore, market segmentation evidence must be weighed along with all other evidence relevant to a like product determination.[9] *See Grupo Industrial Camesa v. United States,* 853 F. Supp. 440, 443–44 (Ct. Int'l Trade 1994) (finding ITC considered seg-

---

[7] Sales data for AlZn is listed under pricing product 14 in the Staff Report.

[8] Domestic producers of AlZn are located east of the Rocky Mountains. Tr. of Oral. Argument at 155 (Oct. 17–18, 1994) ("Tr.").

[9] The court does not construe BHP's argument to be that the Commission failed to recognize and define a regional industry for domestic producers of AlZn, a product market in which BHP did not compete. *See* 19 U.S.C. § 1677(4)(C) (1988).

mented market argument but properly relied on evidence of interchangeability, geographical overlap of sales and same channels of distribution to find one like product). The court finds that the Commission properly considered market segmentation evidence among other evidence relevant to its like product determination.

## 2. *Customer perceptions and product characteristics:*

The Commission found that evidence of differences in customer perceptions, interchangeability, end use, fungibility, and physical characteristics of AlZn did not require a separate like product finding. BHP contends that the Commission ignored evidence of each of these types of differences.

First, with regard to customer perceptions, BHP offered evidence that the long-term product warranty for AlZn was the reason many customers would not choose a substitute material, and that the trademarked names Galvalume and Zincalume were recognizable to a consumer as distinct from the generic category of galvanized steel. The Commission found that although customers may perceive AlZn to possess better corrosion-resistant qualities in certain applications, galvanized sheet was also used for the same applications. *Final Det.* at 165. The court does not find this conclusion unsupported.

Second, as to interchangeability and end use, BHP argues that although the Commission found that AlZn and other galvanized sheet are both used as roofing materials, that fact does not mean the products compete for a specific end use and are interchangeable. As defendant has argued in response, the Commission is not required to find that products must be completely interchangeable. *See R-M Indus.,* 848 F. Supp. at 210 n.9 (finding for purposes of like product definition, not necessary that like product be completely substitutable); *Certain Welded Stainless Steel Pipes from the Republic of Korea and Taiwan,* Inv. Nos. 731–TA–540–541, USITC Pub. 2585, at 9 & nn.20–21 (1992) (final) (finding pipes to be "like," although limited interchangeability because pipes manufactured to specific industry standards); *Polyethylene Terephthalate Film, Sheet, and Strip from Japan and the Republic of Korea,* Inv. Nos. 731–TA–458–459, USITC Pub. 2383 at 11–12 (final) (1991) (noting complete interchangeability never viewed as definitive requirement for inclusion of several domestic products in single like product). The court also notes that even BHP's own product brochure describes many parallels between AlZn and galvanized sheet. App. to Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R., Tab 3, at 2, 5, 7. Thus, although BHP is able to list applications where AlZn may be the preferred material, these examples do not establish lack of interchangeability between AlZn and galvanized steel.

With regard to fungibility, BHP argues that the Commission ignored evidence that establishes AlZn as more fungible with non-metallic roofing materials than with metallic materials. The product brochure, as noted previously, draws comparisons with galvanized sheet, not non-

metallic substances. Also, of the purchasers that reported buying AlZn, most indicated that there were not any non-metallic substitutes for AlZn. *See* Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R. at 33 & nn.95–96; App. to Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R., Tab 21. Other evidence concerning fungibility of AlZn is inconsistent. *See* App. to BHP's Mot. J. Agency R. at App. H *(compare* Ex. 5, ¶ 4 *(Aff. of John Ewing)* (stating Galvalume competes with non-metallic products only in limited sense) *with* Ex. 3, ¶ 13 (Aff. of E. David Melcher) (indicating AlZn competes chiefly with galvanized steel and non-metallic roofing material). While BHP has offered evidence of greater fungibility of AlZn with non-metallic products, there is contrary evidence in the record. When there is a choice between two fairly conflicting views, the court will not substitute its judgment for that of the agency. *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (1985).

Lastly, regarding physical characteristics, BHP contends that the Commission dismissed evidence of differences such as appearance, metallurgical differences, and performance. While it is not disputed that AlZn does exhibit these differences, such differences do not warrant a separate like product finding. *See Certain Welded Stainless Steel Pipes, supra,* at 9 (finding physical characteristics of different specification pipes similar although minor differences in wall thickness and other characteristics related to manufacture to different ASTM specifications). Here, the difference was "one of degree along a continuum." *Final Det.* at 166. The court finds that although there is evidence of some differences in characteristics of AlZn as compared with other corrosion-resistant steel, there is substantial evidence of commonality between the products.

### 3. *Production processes:*

BHP's final challenge concerns the uniqueness of the AlZn production process. In analyzing evidence of the production process, the Commission found that "although an initial investment [was] required to enable a producer to manufacture AlZn on a galvanizing line, once operating, the production lines are interchangeable." *Id.* at 165. The Commission specifically noted the similarities between the manufacturing processes for galvanized steel and AlZn. *Id.* at 165 n.23. BHP maintains that despite these similarities, there is detailed evidence of substantial differences in the AlZn production process, including the type of substrate and pots used, the proportions of various gases used, cooling rates, and the fact that patents and licenses existed to secure the production technology.

BHP asserts that the Commission failed to explain the manner in which it discounted certain evidence and relied upon other evidence to reach its conclusion on this issue. The Commission stated that it found differences in the production process BHP described, and explained why those differences were not significant. *See id.* at 165. Evidence of some

dissimilarities is not sufficient to overturn a determination when there is otherwise substantial evidence to support the Commission's findings. *Torrington Co. v. United States,* 14 CIT 648, 656, 747 F. Supp. 744, 753 (1990). While BHP has provided evidence of a number of differences in the AlZn production process, the court finds that some of these described differences are not required or typical for, or in some cases, not exclusive to, AlZn production. For these reasons the court upholds the Commission's assessment of similarities in production processes between AlZn and galvanized steel.

"Whether the differences among the various [products] are minor or significant is a factual issue for the Commission," and the determination will not be disturbed unless it is found to be unreasonable or not supported by substantial evidence. *Torrington,* 14 CIT at 651–52, 747 F. Supp. at 749. BHP has not demonstrated to the court that the Commission abused its discretion, or ignored substantial evidence, in making its like product determination. Thus, the Commission's like product finding is sustained.

## B. PRESENT MATERIAL INJURY

### 1. *Negligibility exception to cumulation:*

If certain statutory requirements are met, cumulation of imports from two or more countries "subject to investigation" is mandated for the determination of present material injury.[10] 19 U.S.C. § 1677(7) (C)(iv)(I) (Supp. V 1993). The Commission has discretion not to cumulate if a country's imports are found to be negligible and to have no discernible impact upon the domestic industry. *Id.* § 1677(7)(C)(v).

### a. *Majority finding of negligible imports from Brazil, Mexico, New Zealand and Sweden:*

In its present material injury analysis, the Commission did not cumulate corrosion-resistant steel imports from Brazil, Mexico,[11] New Zealand, Sweden[12] and South Africa with imports determined to be injurious, finding that imports from these countries were negligible and did not cause any discernible adverse impact. *Final Det.* at 181–86.

Petitioners challenge the manner in which the Commission applied the negligibility provision of the cumulation statute. *See* 19 U.S.C.

---

[10] The statute provides, in part, that:

(I) In general

For purposes of [evaluating volume and price] * * *, the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

19 U.S.C. § 1677(7)(C)(iv)(I).

[11] Commissioners Rohr and Nuzum dissented from the finding that Mexican imports were negligible. *Final Det.* at 183 nn.182–83.

[12] Commissioner Nuzum dissented from the majority's determination with respect to Sweden. *Final Det.* at 186 n.204.

§ 1677(7)(C)(v).[13] Petitioners assert that the Commission incorrectly found that imports from Brazil, Mexico, New Zealand and Sweden were negligible. In all instances, petitioners argue that on the basis of absolute volumes, these imports accounted for substantial volume and thus must have created a discernible adverse impact on the industry. Petitioners assert that when totalled, as of 1992 the combined market share of negligible imports equalled 1.3 percent, while the share of the smallest non-excluded country equalled .7 percent. Petitioners also rely upon three instances of lost sales due to Swedish and Brazilian imports as evidence of adverse impact. Petitioners' contentions as to these individual countries are based upon the view that "discernable adverse impact" must be measured by absolute volume, value, and market share, without consideration of relative market share and other price-related factors.

As discussed by the court previously in *U.S. Steel Group v. United States*, 873 F. Supp. 673, 692–93 (Ct. Int'l Trade 1994), *appeal docketed*, No. 95–1245 (Fed. Cir. Mar. 21, 1995), *Torrington Co. v. United States*, 16 CIT 220, 790 F. Supp. 1161 (1992), stands for the proposition that the absolute volume of imports does not necessarily have independent significance for negligibility purposes. *See id.* at 229, 790 F. Supp. at 1171. Rather, the Commission weighs several factors in addition to volume, including trends in imports such as price declines, share of apparent domestic consumption, evidence of underselling, substitutability, the price sensitivity of the domestic market, as well as whether imports were isolated and sporadic. *See* 19 U.S.C. § 1677(7)(C)(v).

The majority clearly reviewed these factors in its analysis of negligibility, and its decision to apply the negligibility exception was supported by substantial evidence. The record shows that during the period of investigation the major share of apparent domestic consumption was supplied mostly by the domestic industry (market share by quantity exceeded 82 percent), and cumulated imports accounted for less than 15 percent. *See* Pub. Staff Rpt. at I–149 tbl. 107. Total imports found to be negligible constituted only 1.7 percent of the corrosion-resistant market in 1992. *Id.* Additionally, the majority found a relative lack of price sensitivity in the market for corrosion-resistant products. *Final Det.* at 189.

For Brazil, the Commission observed that during the period of investigation Brazilian imports held a very small share of the market, never exceeding .2 percent. *Id.* at 182. The volume of imports also decreased over the period. *Id.* Although Brazilian imports were found not to be iso-

---

[13] The relevant statutory provision reads:

**(v) Treatment of negligible imports**

The Commission is not required to apply clause (iv) [cumulation] or subparagraph (F)(iv) [cumulation for threat] in any case in which the Commission determines that imports of the merchandise subject to investigation are negligible and have no discernable adverse impact on the domestic industry. For purposes of making such determination, the Commission shall evaluate all relevant economic factors regarding the imports, including, but not limited to, whether—

(I) the volume and market share of the imports are negligible,
(II) sales transactions involving the imports are isolated and sporadic, and
(III) the domestic market for the like product is price sensitive by reason of the nature of the product, so that a small quantity of imports can result in price suppression or depression.

19 U.S.C. § 1677(7)(C)(v).

lated or sporadic, in the context of low and declining volume and market share, and a single confirmed lost sale involving a very small amount, the Commission concluded these imports had no discernible adverse impact. *Id.*

The market share of New Zealand imports declined to .2 percent in 1992 from .3 percent in 1991. *Id.* at 184. The Commission also found a pattern of predominant overselling, with two instances of underselling. *Id.* at 184–85. Absolute volume over the period increased, then decreased in 1992 to levels comparable with 1990. *Id.* at 184. On the basis of such factors as small and declining market share and predominant overselling, the Commission found New Zealand imports to be negligible. *Id.* at 185. Lastly, although the absolute volume of imports from Sweden were found to have increased somewhat during the period, the percentage of market share never exceeded .2 percent. *Id.* at 186. The two instances of confirmed lost sales were for very small quantities. *Id.*

For each of these countries,[14] the Commission clearly reviewed several factors, in addition to absolute volume and market share, to reach its negligibility determinations.

i. Commissioner Brunsdale's separate views:

As in *U.S. Steel Group*, petitioners here take issue with Commissioner Brunsdale's application of the negligibility exception, as she appears to focus on the percentage of the market held by imports from a particular country. Except where additional factors indicate another result is appropriate, if a country's imports account for less than 1 percent (or sometimes less than 1.5 percent) of the U.S. market, generally Commissioner Brunsdale does not cumulate imports. *Cf. Torrington*, 16 CIT at 228, 790 F. Supp. at 1171 (upholding Commissioner Brunsdale's determination that imports from countries with less than 1 percent market share, absent extraordinary circumstances, and in market not very sensitive to price, were negligible). Petitioners' argument fails for the reasons articulated in *U.S. Steel Group*, 873 F. Supp. at 689.

Petitioners' additional argument is that Commissioner Brunsdale's criticisms of certain presentations by petitioners' economists further undermines her overall analysis. Specifically, Dr. Sanford Grossman presented a model to demonstrate that even the smallest amount of imported steel could have a significant effect on the market because of the information it may convey about the intent of the foreign supplier. *Final Det.* at 312. Commissioner Brunsdale found that

> [s]ince the information about the willingness * * * to sell in the United States at lower prices will be present whether or not any particular small supplier sells in the U.S. market, no individual small supplier will provide unique information, and its sales may be 'negligible and have no discernible adverse impact.'

---

[14] Petitioners do not challenge the negligibility finding as to imports from South Africa. South African imports only entered the U.S. market in 1992, and the Commission found the market share, by quantity, to be .4%. *Final Det.* at 185. The Commission determined that the low volume and market share warranted a finding of negligibility. *Id.*

*Id.* The Commissioner also found that Dr. Grossman had failed to consider why a foreign supplier would utilize large quantities of previously unused capacity to expand shipments, or would divert large quantities from third country markets, to the United States. *Id.* Commissioner Brunsdale concluded that the presence of large quantities of excess capacity indicated that the price of steel was so low that the capacity could not be used profitably, and that the willingness to put that capacity to use for sales to the United States indicated the price in the United States was higher. *Id.* Commissioner Brunsdale thus found that a foreign producer would divert large quantities to the United States only if the U.S. price was higher than that which the foreign producer would receive in other markets, as a producer was inclined to sell where it would get the highest price to yield the highest profits. *Id.*

Petitioners assert that what Commissioner Brunsdale essentially stated that because it is impossible to prove which small foreign supplier is having the adverse impact, therefore none of the suppliers are having that impact. This characterization is inaccurate. Insofar as petitioners' objection is an extension of its objection to Commissioner Brunsdale's overall approach to her negligibility analysis, it is rejected for the reasons previously stated. The court finds that for Brazil, New Zealand and Sweden, the majority's determinations were supported by substantial evidence and in accordance with law.

### ii. Mexico:

With regard to Mexico, the majority found that market share had declined from .9 percent to .7 percent from 1990 to 1991, before increasing to .8 percent in 1992. *Id.* at 183. Volume fluctuated at low levels. *Id.* On the basis of small volume and market share, the Commission determined Mexican imports were negligible.

Petitioners' general challenges, which have been rejected, applied to Mexican imports as well. Petitioners raised two contentions at oral argument concerning these imports: 1/ the eight examples of overselling by Mexican imports are for only a small quantity of total Mexican imports, and 2/ that the Commission's use of price data without transportation costs created a bias in favor of finding overselling. Although the Commission did not note the instances of overselling in reaching its negligibility determination, *see id.* at 183, in addition to pricing data for non-niche products, there is evidence in the record that average unit values for niche products exceeded domestic price levels. *See* Conf. Staff Rpt. at N–49 tbl. N–47, N–64 tbl. N–66; F–45–F–46 tbl. F–4; *see also* Tr. at 193. Further, for the reasons articulated in *U.S. Steel Group,* 873 F. Supp. at 699–700, the Commission's practice of excluding transportation costs in determining pricing levels in the steel industry is not error.

Petitioners also allege that Commissioner Watson, as evidenced in his separate views, misapplied the negligibility exception in his assessment of Mexican imports, as he discounted the importance of American Goods Returned ("AGR") imports for purposes of evaluating volume and mar-

ket share. Petitioners argue that any benefits from AGR imports were realized only by U.S. cold-rolled steel producers. Defendant counters that Commissioner Watson reasonably weighed evidence of benefits from the AGR program, as evidence of another relevant economic factor, *see* 19 U.S.C. § 1677(7)(C)(v), to determine negligibility.

Commissioner Watson noted that domestic producers had entered into supply and distribution arrangement with a Mexican producer, Industrias Monterrey S.A. de C.V. ("IMSA"). *Final Det.* at 205; *see* Pl. IMSA's Post-Oral Argument Subm., Tab 2 (distribution agreement dated Feb. 22, 1991). As part of these arrangements, some AGR imports were shipped back to their original source and in other cases they were sent directly to U.S. customers of the domestic supplier. *Final Det.* at 205. Commissioner Watson thus concluded in his separate views that competition between AGR imports from Mexico and domestic products was attenuated, noting that "a significant number of AGR transactions clearly [did] benefit the domestic industry." *Id.*

Respondent IMSA indicated, and Commissioner Watson also stated, *id.* at 205, that Mexican galvanizers had provided a service to the U.S. steel industry to complement and "round out" coated steel product lines. At oral argument, however, petitioners cited evidence showing that only a small portion of the quantity that IMSA shipped to the United States consisted of these AGR imports to a single producer, while the remainder consisted of Mexican steel. *See* Pet'rs' Post-Oral Argument Subm., Tab 13, at Ex. 3, ¶ 14 (Aff. of E. David Melcher) (indicating that over period of investigation less than 10,000 tons from IMSA under distribution agreement were AGR imports). Thus, a significant amount of the tonnage IMSA shipped during the period was not shipped in connection with IMSA's arrangements with a specific U.S. producer.[15] In fact, defendant conceded that only 14 percent of the volume of AGR imports from IMSA in 1991 fell within the agreement IMSA had with the U.S. producer. Tr. at 243. For all of the AGR imports from IMSA in 1990 and 1992, as well as 86 percent of the imports in 1991, defendant was unable to indicate how these imports had benefitted either the U.S. cold-rolled producer involved in the IMSA agreement,[16] or the corrosion-resistant industry in general. *Id.* at 245.

The court finds that although Commissioner Watson concurred with the joint determination as to Mexico, and addressed the importance of AGR imports only in his separate views, Commissioner Watson's overall

---

[15] Table 82 of the Staff Report excludes the quantity of AGR imports shipped during the period of investigation. *See* Conf. Staff Rpt. at I–203 tbl. 82. The Commission staff noted that IMSA had stated that slightly more than 50% of IMSA imports by volume fell within the AGR category (Item 9802.00.60, HTSUS). *Id.* at I–204; *see* Pl. IMSA's Post-Oral Argument Subm. at Tab 1 (IMSA trade data comparing import level for AGR and non-AGR corrosion-resistant products).

[16] The cold-rolled industry is not the industry at issue, and benefits to it may not be considered unless the corrosion industry is indirectly benefitted as well. *Cf. Final Det.* at 209 (dissenting view of Commissioner Rohr noting that benefit of AGR imports, produced for U.S. purchasers from cold-rolled steel previously exported to Mexico from the United States, on cold-rolled products industry was not relevant to his decision).

analysis of the negligibility of Mexican imports must be reconsidered.[17] The court cannot discern to what extent Commissioner Watson assigned diminished importance to AGR import figures. The court notes that Commissioner Watson clearly weighed AGR information less heavily than non-AGR data, because he stated that the exclusion of AGR imports from market share data would result in a market share below .5 percent for each year of the period of investigation. *Final Det.* at 205 n.9. While Commissioner Watson did not exclude AGR data altogether, the court is concerned that Commissioner Watson may have given less than full consideration to a substantial amount of imports, based on the assumption that they benefitted specific U.S. producers. Additionally, the court does not find evidence that AGR imports actually benefitted the corrosion-resistant industry, the industry at issue.

For these reasons, the court remands Commissioner Watson's negligibility determination as to Mexico.

b. *Cumulation of French imports:*

Respondent Usinor challenges the plurality determination that a reasonable overlap of competition existed between imports from France and domestic products, and that these imports were not negligible. Usinor argues that the negligibility analysis by Commissioners Crawford and Watson for France is inconsistent with the analysis for Mexico, as the record evidence and findings for each country appear quite similar. Usinor also argues that the plurality disregarded its findings of price sensitivity in its negligibility analysis. Further, Usinor contends that the plurality improperly relied on aggregate domestic pricing data to determine the presence of underselling. Additionally, Usinor claims that Commissioner Nuzum erroneously relied upon LTFV margins, available prior to voting on negligibility, which were later corrected to be significantly lower. Lastly, in the context of the negligibility exception, Usinor takes issue with Commissioner Nuzum's evaluation of "whether [imports] *discernibly contribute* to the adverse impact that the other, cumulated imports are having on the domestic industry." *Id.* at 357.

i. Comparison to Mexican imports:

Usinor characterizes the factual record for imports from France and Mexico as remarkably similar, and thus concludes that Commissioners Crawford and Watson were in error in not finding French imports negligible. Usinor points to comparable market share percentages and trends, and to the fact that the absolute volume of Mexican imports was in excess of that of French imports in each year of the investigation.[18] *See id.* at 208.

---

[17] The joint determination on negligibility of Mexican imports does not make a distinction as to AGR import volume. *See Final Det.* at 183. The joint determination on cumulation does recount the arguments of the parties concerning treatment of AGR imports, and concludes that AGR imports would not be excluded from consideration of Mexican imports overall. *See id.* at 179 & n.145.

[18] Market share for France increased steadily from .5% to .7% during the period, while Mexican market share declined from .9% to .7%, then increased to .8%. *Final Det.* at 182, 183; *see also* Pub. Staff Rpt. at I–139 tbl. 96.

In terms of absolute tonnage, value, and as a percentage of apparent domestic consumption, imports from Mexico declined slightly over the period of investigation. *See* Pub. Staff Rpt. at I–139 tbl. 96, I–149 tbl. 107. A review of these same factors for French imports shows a steady increase over the same period. *Id.* Mexican imports oversold domestic products in all pricing comparisons.[19] Pub. Staff Rpt. at I–174–I–175 tbls. 112–13. In comparison, French imports undersold domestic products in 10 out of 22 instances.[20] *Final Det.* at 183; Pub. Staff Rpt. at I–172–I–174 tbls. 110–12. Also, Mexican unit values were substantially higher than French or domestic unit values, whereas French unit values were below domestic unit values in 1991–92. *Compare* Pub. Staff Rpt. at I–139 tbl. 96 *with id.* at I–55 tbl. 16. Although there was no confirmed lost sale evidence for Mexico, while for France there was one instance of a large confirmed lost sale, *Final Det.* at 183; Conf. Staff Rpt. at I–295 tbl. 117, defendant conceded at oral argument that lost sales evidence was not a sufficient basis for a distinction.[21]

As noted by Commissioner Rohr, Mexican imports are at the "very border line of negligibility." *Final Det.* at 208. Furthermore, the court has remanded one Commissioner's negligibility determination for Mexico. In addition, the court has not found that the evidence supports Usinor's assertion that trends for France and Mexico were quite similar. Clearly there are differences in trends in market share and pricing patterns over the period. Thus, the court rejects Usinor's arguments based upon treatment of Mexican imports.

ii. Price sensitivity findings:

The Commission found that the market for corrosion-resistant steel was relatively insensitive to price. *Id.* at 189. Usinor reasons that because the Commission made this finding, it negates the impact of price effects by French imports. Thus, Usinor asserts the Commission should have given less weight to underselling evidence, and should have reached a determination that French imports were negligible. Defendant responds that the Commission's reliance on underselling evidence was reasonable, and that a finding of relative price insensitivity does not preclude finding detrimental price effects caused by underselling. Defendant also relies on evidence that most French imports were produced by the domestic industry, and were found in general to be comparable in quality. *Id.* at 175.

What Usinor asserts is that if pricing factors are not contributing to present material injury, then these factors cannot be used to show that imports have discernible impact. The practical effect of this reasoning is

---

[19] During the period of investigation, the majority of Mexican imports were sold through the distributor/service center channel. Tr. at 193.

[20] French products undersold U.S. products in 10 of the 13 instances of distributor/service center sales. Pub. Staff Rpt. at I–173 tbl. 111; Tr. at 195. Thus, the Commission relied upon evidence of underselling in a sector of the market where competition was found to be more intense. *See Final Det.* at 190.

[21] The record reflects that the confirmed lost sale to French products in fact is a sale lost to French, Japanese and Italian products, but with no indication of what portion of the sale is attributable to France. *See* Mem. to Commissioners Watson and Nuzum from International Economist, List 2, Doc. 224, pt. II, at I–44 tbl. 119 & n.3 (July 26, 1993).

that to cumulate each country's imports, one must first find that these imports caused material injury. This reasoning contradicts the purpose of the cumulation provision. *See* H.R. Rep. No. 1156, 98th Cong., 2d Sess. 173 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5220, 5290 (stating imports from various countries may each account for small percentage of total market penetration, but when combined may cause material injury). Thus, Usinor's argument on this point fails.

iii. Aggregate price data:

Usinor objects to the Commission's use of aggregated (quarterly) domestic pricing data in its analysis of underselling of French imports. *See* Conf. Staff Rpt. at N–14–N–18 tbls. N–13–N–18. Usinor alleges that using this aggregated data masks domestic price leadership and falsely depicts importers as downward price leaders. Defendant responds that the use of aggregate price data was reasonable in light of the large volume of price data collected, and because this methodology has been applied previously. *See, e.g., DRAMs of One Megabit and Above from the Republic of Korea,* Inv. No. 731–TA–556, USITC Pub. 2629, at I–92 & App. H (May 1993) (final); *Magnesium from Canada,* Inv. No. 701–TA–309, USITC Pub. 2550, at I–86–I–87 & tbls. 47–48 (Aug. 1992) (final). Further, petitioners assert that if the Commission had conducted a disaggregated analysis, the result would have been nearly identical. *See* Def.-Ints.' Mem. in Opp'n to Pls.' Mots. J. Agency R. at Ex. 2 (charts of pricing comparisons by product group for France and for individual U.S. producers).

The court notes that the Commission has broad discretion in selecting a methodology to assess and analyze the significance of price undercutting. *See Copperweld Corp. v. United States,* 12 CIT 148, 161, 682 F. Supp. 552, 565 (1988); *Cemex, S.A. v. United States,* 16 CIT 251, 261, 790 F. Supp. 290, 299 (1992) (finding statute does not require assessment of price-depressing effects of imports in any particular manner), *aff'd without op.,* 989 F.2d 1202 (Fed. Cir. 1993). Further, because the Commission must determine if imports caused depression or suppression of domestic prices, it is irrelevant that some domestic prices may have been below the price of imported goods, as long as imports, on a weighted-average basis, undersold the industry overall. *See Calabrian Corp. v. United States,* 16 CIT 342, 350–51, 794 F. Supp. 377, 385–86 (1992) (upholding aggregate analysis of economic factors for review of material injury to domestic industry). Accordingly, the court upholds the Commission's analysis of price data.

iv. Commissioner Nuzum's separate views:

Usinor challenges Commissioner Nuzum's reference to LTFV margins in her determination, as well as her application of the negligibility exception. First, in her discussion of cumulation of French imports, Commissioner Nuzum noted that the volume of imports increased more than 50 percent during the period of investigation, and that market share increased. *Final Det.* at 366. Commissioner Nuzum also noted that price comparisons showed 10 instances of underselling and

12 instances of overselling. *Id.* Commissioner Nuzum noted that the unit value of these imports decreased and was well below the average unit value of all subject imports. *Id.* at 366–67. Commissioner Nuzum also commented that France had a final subsidy margin of 15 percent and final dumping margins ranging from 53 to 110 percent.[22] *Id.* at 367. Commissioner Nuzum concluded by stating that based upon significant presence in the U.S. market, increasing volume and market share, and evidence of significant competition with domestic products and other imports, she found imports from France were not negligible. *Id.*

Usinor maintains that Commissioner Nuzum must reconsider her determination to adjust for the change in margin, in accordance with the holding in *Borlem S.A.—Empreedimentos Industriais v. United States,* 913 F.2d 933 (Fed. Cir. 1990) *("Borlem II").* The court finds that Usinor's application of *Borlem II* is too broad. In *Borlem S.A.—Empreedimentos Industriais v. United States,* 13 CIT 535, 537, 718 F. Supp. 41, 42–43 (1989) *("Borlem I"),* Commerce had reduced a dumping margin for a large Brazilian producer from 19.93 percent to a *de minimis* amount, .04 percent, after the Commission had issued its final determination. 13 CIT at 537, 718 F. Supp. at 42–43. The change to a *de minimis* rate caused the Brazilian producer to be excluded from the affirmative determination. *Id.* The change discussed in *Borlem I* indicated that ITC should not consider the affected volume of Brazilian imports at all. This court's remand of the Commission determination was based upon the fact that the foreign producer's "dumping with *de minimis* margins [was] of such substantial significance that the ITC might well have changed its determination," *Id.* at 544–45, 718 F. Supp. at 48, and thus was affirmed. *Borlem II,* 913 F.2d at 937.

Thus *Borlem II* does not stand for the broad proposition that ITC must reconsider a final determination based upon affirmative LTFV margins that later change. The dumping margin here of 39.4 percent remained significant. Furthermore, Commissioner Nuzum's finding is not based on the specific margin.

Second, Usinor argues Commissioner Nuzum failed to apply the negligibility exception properly, because she did not look at countries individually. The court has concluded previously that Commissioner Nuzum does review each country individually for this purpose. The court also upheld Commissioner Nuzum's application of an additional step to determine negligibility, that is, whether the imports at issue "discernibly contribute" to an adverse impact when combined with other imports, is permissible for these products. *Kern-Liebers USA, Inc. v. United States,* Slip Op. 95–9, at 65 (Jan. 27, 1995), *appeal docketed,* No. 95–1257 (Fed. Cir. Mar. 27, 1995).

---

[22] Subsequently, the dumping margin for France was corrected to 39.4% for corrosion-resistant products. *See Certain Corrosion-Resistant Carbon Steel Flat Prods. from France,* 58 Fed. Reg. 44,169, 44,170 (Aug. 1993) (antidumping duty order & amendments to final determs. of LTFV sales).

2. *Causation analysis:*

Joint respondents contend that the Commission failed to analyze volume and price within the context of conditions of competition in the corrosion-resistant steel industry. Joint respondents also argue that the causation of injury determination reached by the Commission is inconsistent with other findings made by the Commission. Defendant and petitioners respond that the Commission made findings in accordance with the statutory requirements.

In its evaluation of the volume of imports under investigation, the Commission

> shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

19 U.S.C. § 1677(7)(C)(i). To analyze price effects of imports on domestic prices, the Commission must consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

*Id.* § 1677(7)(C)(ii). To examine the impact of imports, the statute requires that the Commission evaluate all relevant factors, including, but not limited to,

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

*Id.* § 1677(7)(C)(iii). Section 1677(7)(C)(iii) also requires the Commission to evaluate those relevant economic factors described within the context of the business cycle and conditions of competition. *Id.*

Joint respondents mistakenly construe the statute to require the Commission to delineate its reasoning under each factor in § 1677(7)(C)(iii). The statute requires only that the Commission explain its analysis with respect to elements in § 1677(7)(B). "[T]he Commission may not need or be able to consider each listed factor[,]" and only need provide an adequate explanation of the "core factors directed by the statute." *See Trent Tube Div. v. Avesta Sandvik Tube AB,* 975 F.2d 807, 814 (Fed. Cir. 1992). Further support for the Commission's approach is

found in *Grupo Indus. Camesa v. United States,* 853 F. Supp. 440 (Ct. Int'l Trade 1994), in which the court upheld the determination at issue despite the Commission's failure to discuss the impact of imports within the context of the business cycle of the affected industry. *Id.* The court in *Grupo* reasoned that the Commission is

> 'charged only with rationally considering impact on the domestic industry in light of the relevant factors' and 'is not required to issue findings and conclusions on an issue concerning a statutory element simply because it was presented by [a party].'

*Id.* (quoting *Hercules, Inc. v. United States,* 11 CIT 710, 743, 673 F. Supp. 454, 482 (1987) (citations omitted)).

Joint respondents' reliance upon *Mitsubishi Materials Corp. v. United States,* 820 F. Supp. 608 (Ct. Int'l Trade 1993), does not yield a different result. Although the court in *Mitsubishi* remanded the Commission's determination for failure to explain the impact of cost trends on price, the court did so on the basis that the Commission had ignored significant evidence contradictory to its finding. *Id.* Contrary to respondents' interpretation, *Mitsubishi* discussed the importance of the substantial evidence standard, and does not modify the holding in *Grupo Indus..* The court does not find this general contention by respondents to have merit. The court will turn to specific issues raised concerning analysis of present injury.

a. *Volume effects:*

With regard to the adequacy of discussion of volume effects, respondents contend that the majority's analysis was brief and unclear. The court finds that the majority performed an analysis of product mix and substitutability between domestic and imported products within the context of its cumulation analysis. *Final Det.* at 173–79. The majority detailed its analysis of volume effects further in the individual additional views of Commissioners. *See id.* at 286–93 (Commissioner Newquist), 321–25 (Commissioner Brunsdale), and 365–68 (Commissioner Nuzum). The Commission reviewed and rejected the assertion that the domestic industry was unable to produce a large percentage of niche products, and was not required to restate this conclusion in its analysis of volume effects. *See Steel Wire Rope from the Republic of Korea and Mexico,* Inv. Nos. 731–TA–546 and 547, USITC No. 2613, at 21–23 (Mar. 1993) (final) (reaching similar conclusion in context of cumulation analysis), *aff'd in, Grupo Indus.,* 853 F. Supp. at 445. The combination of the overall determination, the cumulation discussion and the individual discussions enable the court to discern the Commission's conclusion on substitutability in the volume effects context. As long as the agency's analysis may "reasonably be discerned," the court may uphold the agency's decision. *See, e.g., Ceramica Regiomontana, S.A. v. United States,* 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974)).

470

Respondents characterize the majority's analysis as contrary to law, in its incorporation of a presumption that displacement of domestic products has occurred when import volume increases. *See, e.g., Committee of Domestic Steel Wire Rope v. United States,* 818 F. Supp. 376, 379–80 (Ct. Int'l Trade 1993) (rejecting argument that significant increase in import penetration demonstrates injury to industry); *Coated Groundwood Paper from Belgium, Finland, France, Germany, and the United Kingdom,* Inv. Nos. 731–TA–487–490 and 494, USITC Pub. No. 2467, at 17–21 (final) (Dec. 1991) (finding increase in imports did not indicate displacement of domestic sales in light of factors such as changes in demand). Respondents' reliance on these cases is misplaced. In *Domestic Steel Wire Rope,* the court found that at the same time that import volume increased, the domestic industry's net sales, gross profits and operating income also increased, thus the court concluded that the increase in import volume did not cause harm to the industry. 818 F. Supp. at 379–80. Here, the Commission found that imports increased while domestic profitability and capital expenditures fell. *Final Det.* at 191. Also, the domestic industry lost market share, while imports gained market share. *Id.* at 188.

Respondents further contend that the Commission's displacement finding is contrary the evidence on record. Respondents assert that there is substantial evidence that corrosion-resistant products were highly differentiated and non-substitutable, that there was no trend by purchasers to switch to foreign suppliers, that there were few instances of lost sales, and that domestic industry could not produce many of the niche product imports.

Defendant and petitioners maintain that during the period of investigation the domestic industry was able to and did produce the majority of corrosion-resistant products required by U.S. customers. In addition, defendant and petitioners assert that the increase in imports of products that the domestic industry did not produce was small in comparison to the volume of imports that displaced substitutable domestic products.

Respondents also assert that the Commission in some instances made findings as to market sectors but failed to analyze volume effects within these sectors. The court will address in turn respondents' arguments as to market sector analysis and displacement.

i. Market sector analysis:

In particular, respondents allege the Commission discussed import volumes without acknowledging evidence of relative price insensitivity and fragmentation of the market into two segments: "precision-engineered" products[23] and "traditional" products. Defendant and petitioners argue that the Commission did not make a finding of these different

---

[23] Respondents appear to include in this category automotive steel, AlZn and Niche products 41, 45, 46, 47, 65, 66 and 67. Pls.' Mem. Supp. Mot. J. Agency R., Ex. B at n.1.

market sectors, thus the Commission was not in error in declining to evaluate volume effects along sector lines.

The Commission considered and rejected arguments to separate automotive steel and AlZn into separate like product categories. *See id.* at 163–66. The Commission also determined that only a small number of imports did not compete with domestic products. The Commission found that most "niche" or specialty products were in fact produced by the domestic industry. *Id.* at 173 n.84, 174–79, 181, 192. The Commission concluded that there was a reasonable overlap of competition between the imports, and with domestic products. *Id.* at 173.

The court in *Grupo Indus.*, reviewed the Commission's rejection of a similar argument that segmentation of the market was a determinative condition of competition. 853 F. Supp. at 444. In upholding the Commission's determination, the court found that the Commission had considered, but declined to adopt, the segmented market argument, on the basis that a reasonable degree of direct competition existed between the imported and domestic products at issue. *Id.* at 444–45. Similarly, the Commission here reasonably rejected the view that a segment of the imported product market did not compete with domestic product, thus the Commission also rejected the segmented analysis that joint respondents now urge.

Although the Commission made observations about the automotive industry and the precision-engineered products the industry needed, including increased demand for precision-engineered products, *Final Det.* at 168, the Commission reached similar conclusions about the corrosion-resistant industry in general. *Id.* at 168–69. In the non-automotive industries, demand had also increased, although to a lesser extent, and the Commission noted that the corrosion-resistant industry in general had taken steps to add new capacity to meet this new demand. *Id.* at 168.

Further, the Commission recognized the importance of qualification requirements, not just for particular end-users, finding that most purchasers reported that they or their customers required suppliers to be pre-qualified to guarantee products would meet quality and performance standards. *Id.* at 169. While auto-makers had the most stringent requirements, the Commission did not find auto-makers unique, and it found variance in the length of the qualification process among auto-makers. *Id.* The Commission also found that half of all purchasers did not switch suppliers on the basis of price, and had not switched in the past five years. *Id.*

This court has previously rejected other attempts to require a specific segmented market analysis. *See Encon Indus., Inc. v. United States,* Slip Op. 92–164, at 3–6 (Sept. 24, 1992) (rejecting argument that ITC failed to segment for material injury analysis, on basis that under facts of case this was improper like product challenge). In this case, the court finds no particular fact that would require the approach sought by respondents.

ii. Substitutability and price sensitivity:

Concerning price sensitivity and substitutability, respondents assert that the majority, and the Commissioners in their additional views, found corrosion-resistant products to be relatively insensitive to price. Respondents argue that where a product market is price insensitive, purchasers buy for reasons other than price, thus relative shifts in market share are attributable to causes other than quick price changes caused by lower-priced imports. Respondents misconstrue the Commission's findings on this issue.

The majority determined that the market was relatively insensitive to price, noting that price changes were not likely to cause shifts in volume in the short term. *Final Det.* at 189. Commissioner Rohr found corrosion-resistant products to show a lower price sensitivity than for other steel products. *Id.* at 207. Commissioner Nuzum found the market to be "rather price insensitive." *Id.* at 365. Commissioner Crawford also determined that the products were "highly differentiated, with numerous differences in the products themselves, * * * and other non-price factors." *Id.* at 341.

The majority did not find that corrosion-resistant products were non-substitutable. Rather, the majority found that there was significant domestic production of niche products. *Id.* at 192. The majority was also presented with evidence that weighted average elasticity of substitution for corrosion-resistant products was above 1.5 and below 3.0. *See* Final Economic Memorandum to Commission from International Economist, List 2, Doc. 213, at 17 (July 22, 1993).

The Commissioners' additional views do not undermine these findings. Commissioner Rohr, in explaining his overall approach to analysis of price sensitivity, stated that he used "price sensitivity" to indicate the responsiveness of the domestic industry to price in general. *Final Det.* at 77. Thus, Commissioner Rohr generally considered it less likely that prices for one differentiated product would affect the prices of another, and he concluded that the effect of imports on a particular differentiated product was lessened. *Id.* This assessment does not mean that competition does not exist, but rather that the number of competing U.S. and foreign producers was smaller.

Commissioner Nuzum's price sensitivity findings are also not inconsistent with a finding of displacement. Commissioner Nuzum also stated in her determination that while small amounts of imports alone may not cause price suppression or depression, here she found that smaller suppliers each had a discernible adverse impact on the domestic industry. *Id.* at 365 n.65. She also found that while certain imports from Canada, Germany, Japan and Korea served needs in the market not met by U.S. producers, these imports comprised only a small portion of total imports. *Id.* at 366. Commissioner Crawford similarly found substitutability to be limited, but not non-existent. *See id.* at 341. While the Commission determined that substitutability for corrosion-resistant products was limited, this means simply that effects in volume, price

and impact on the industry are smaller. *See R-M Indus.*, 848 F. Supp. at 210–11.

iii. Trends:

Respondents further argue that the record evidence does not support the Commission's displacement theory. Instead, respondents assert, the evidence shows no trend that purchasers switched suppliers, very few lost sales, and an inability of the domestic industry to produce certain specialized or niche products that correlates to an increase in demand for imported products. Respondents indicate that the domestic industry was unable to produce substitutable products because U.S. mills were not yet qualified to do so, or because these producers had added the relevant new productive capacity only recently. Defendant and petitioners maintain that the record evidence contradicts these assertions.

Respondents also rely upon a statement made in the Staff Report, indicating that "most purchasers typically maintain a few approved suppliers and do not readily switch suppliers from order to order because of a lower quoted price or for any other single factor." Pub. Staff Rpt. at I–165. This statement is followed with the statement that "[p]urchasers reported switching from foreign to domestic, domestic to foreign, * * * with no clear trend evident." *Id*. These findings do not demonstrate to the court that the Commission contradicted its determination concerning substitutability and displacement, as some switching did occur, although no pattern or trend was discerned.

iv. Lost sales:

The Commission noted in its analysis of price effects that confirmed lost sales supported their finding of price suppressing effects. *Final Det.* at 191 & n.238. These lost sales included an especially large sale lost to products from France, Japan and Italy, as noted by the Commission. Conf. Staff Rpt. at I–295 tbl. 117.

Respondents argue that the evidence of lost sales is flawed, and does not support the Commission's displacement finding. Respondents assert that the large lost sale allegation for France, Japan and Italy was outside the period of investigation, that specific amounts were not clearly attributable to France and Japan, and that the allegation was biased. Defendant indicated that the Commission staff had properly included this lost sale, as lost sales were evaluated for both the preliminary investigation beginning in 1989, as well as the final investigation. Additionally, although the lost sale was not apportioned for each country involved, the Commission staff noted that fact. *Id*. at I–295 & n.3. Further, respondents have not offered evidence to establish that the allegation was biased.

474

Respondents' arguments as to the validity of confirmed lost sales allegations from Germany and Korea do not succeed.[24] Respondents allege that these sales occurred in a market sector, "commodity" products, that remained stable. As the court has found respondents' segmentation argument to be flawed, *supra* at pp. 42–45, this contention similarly fails.

v. Domestic production of niche products:

The Commission collected data on niche products and found that only a very small portion was not produced by domestic mills. *Final Det.* at 172–86, 173 n.84. Specifically, the data before the Commission indicated that the domestic industry did not produce six niche products (products 45, 46, 63, 65, 66 and 67). Conf. Staff Rpt. at F–40–F–42 tbl. F–4. In each year of the period of investigation, these products never exceeded 6 percent by volume of total imports. *See id.* at F–39–F–46 tbl. F–4. As to the eight niche products the domestic industry did produce (products 39–44, 47 and 64), in most instances domestic mills supplied more than 75 percent of the domestic consumption for the product.[25] *See id.* at F–39–F–41 tbl. F–4. The Commission also found that the domestic corrosion-resistant industry had invested substantially in expansion and upgrading of facilities, and to serve growing demand, had brought new capacity on line or shortly was to do so. *Final Det.* at 168.

Respondents contend that the domestic industry was incapable of producing or did not qualify to supply products 43 and 44, thus the domestic industry did not compete in categories where the increase in imports was concentrated. Respondents rely upon letters from Japanese "transplants" and joint ventures (auto manufacturing plants) in the United States indicating lack of domestic commercial availability for these products. *See* App. to Pls.' Mem. Supp. Mot. J. Agency R., Tab B at 62–65 & Exs. A–1 at 9, A–3 at 4–5, A–5 at 3, A–6 at 3, A–7 at 2 (Resp'ts' Prehrg. Br.). The record does not support respondents' assertion for several reasons.

First, respondents argue that the domestic industry falsely reported all manufacture of product 43, because it is produced by a patented process owned by a Japanese producer, but is not licensed. In fact, petitioners demonstrated that one domestic producer sells substrate for product 43 to a joint venture company in the United States in which both the domestic producer and the Japanese producer have an interest. *See* Pub. Staff Rpt. at I–46 tbl. 13. Some of this substrate subsequently coated by

---

[24] Respondents also contest the lost sales allegations concerning imports from Sweden and Brazil. Respondents argue that the sale attributed to Sweden is contradicted by pricing data showing consistent overselling in the matching product category (product 14). Respondents characterized the lost sale attributed to Brazil as occurring in a "stable" market sector, thus they contend this lost sale was erroneously recorded.

The lost sale attributed to Swedish imports however was confirmed by Commission staff, and petitioners indicate that in fact the lost sale was for a product not identical in specifications to product 14. *See* Conf. Staff Rpt. at I–295 tbl. 117; Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R. at 74 n.212. Additionally, as imports from both Sweden and Brazil were found to be negligible, the court finds these challenges to be unavailing.

[25] Over the period of investigation, the domestic industry produced a low percentage of domestic consumption for products 43, 44 and 47. *See* Conf. Staff Rpt. at F–40–F–41 tbl. F–4. The percentage for product 41 increased over the period, from a small amount in 1990 to a substantial percentage in 1991 and 1992. *See id.* at F–39 tbl. F–4.

the joint venture company was sent back to the U.S. producer for use in automotive products. *See* Def.-Ints.' Post Oral Arg. Subm., Tab 5, Ex. 36, at 9 (domestic production summary of product 43), and Tab 6, Ex. 41 (invoices indicating product within specifications for product 43[26]) (Pet'rs.' Prehrg. Br., vol. 6D).

Second, the increase in the volume of imports of products 43 and 44 between 1991 and 1992 accounted for under 140,000 tons. *See* Conf. Staff Rpt. at F–40 tbl. F–4. This amount does not explain the total increase in import volume found by the majority, which was in excess of 500,000 short tons. *See Final Det.* at 188 n.223. If respondents' argument were meritorious, the volumes for Japanese imports of products 43 and 44 would most clearly show an increase, but in fact Japanese imports only accounted for a small portion of the increase in import volume. *See* Conf. Staff Rpt. at F–40 tbl. F–4.

Third, respondents rely upon letters by purchasers evidencing problems with domestic sourcing, to support a direct correlation between the increase in demand for certain automotive parts made from products 43 and 44, and the increase in import volume. These letters are too vague to support this contention. Although respondents were able to quote figures concerning the volume increase in models of automobiles for which certain niche products were used, there was no indication as to how this information translated into increases in demand measured in actual tonnage. *See* Pls.' Mem. Supp. Mot. J. Agency R. at 69–72; *see also* App. to Pls.' Mem. Supp. Mot. J. Agency R., Tab B, Ex. A–3, at 3, and Tab C, at 48–52 & Ex. 5. Additionally, extensive affidavits from domestic producers attest to supplying much of the relevant niche products to major U.S. automakers. *See, e.g.*, App. to Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R., Tab 13B, Ex. 3 at ¶¶ 7, 10; Ex. 20 at ¶¶ 3–4; Ex. 32 at ¶ 6.

Lastly, at oral argument, petitioners asserted that there was an error in the data listing Canadian imports of product 43 in 1992, because Canadian producers were not licensed to manufacture product 43. As respondents indicated that only Japanese producers and their affiliates were able to manufacture the product at that time, it is likely that the ITC's data is in error. The court notes that the quantity listed erroneously was in excess of 100,000 tons. Conf. Staff Rpt. at F–40 tbl. F–4. This error together with the court's earlier conclusions with regard to the relatively low overall import volume of products 43 and 44, *see supra* pp. 50–51, undercuts respondents' argument.

Respondents claim there was no domestic production available for other niche products.[27] Specifically with regard to products 46, 63, 65,

---

[26] At oral argument, defendant and respondents argued that certain invoice dates submitted for product 43 were not within the period of investigation. Petitioners responded that the invoices were matched to orders placed within the period of investigation. This seems to be largely true.

[27] At oral argument, petitioners contended that the Commission staff erred in neglecting to list data concerning domestic manufacture of product 45 for 1992. *See* App. to Def.-Ints.' Mem. Opp'n to Pls.' Mots. J. Agency R., Tab 22, List 2, Admin. Doc. 301.22, at 18 (producer's questionnaire and attached product brochure listing specification range). The court notes that the questionnaire information lists tonnage of corrosion-resistant product manufactured, but not

66, and 67, while respondents argue that the Commission ignored evidence of the domestic industry's inability to produce these products, in fact the Staff Report does not list any U.S. shipment of these products. *See id.* at F–40–F–42 tbl. F–4. Thus, although respondents dispute evidence that petitioners submitted to the Commission indicating that substitutable domestic products were available, this point is moot, as in its discussion of competition in niche products, the Commission relied upon data contained in Table F–4 of the Staff Report. *See Final Det.* at 173 & n.85; 177 & n.120; 178 & n.130 (citing Conf. Staff Rpt. at F–39–F–46 tbl. F–4). Further, upon the basis of letters and a questionnaire response from U.S. purchasers, respondents claim that petitioners do not make product 64. *See* Jt. Pls.' Post-Oral Arg. Subm., Tab 2C, at 35 (purchaser's questionnaire response (List 2, Doc. 301.399, Question III.D.9); *see, e.g.,* App. to Pls.' Mem. Supp. Mot. J. Agency R., Tab B, Exs. A–2 at 4, A–4 at 3 (letters from auto manufacturers). Petitioners have submitted evidence to the contrary that was also before the Commission. *See* Def.-Ints.' Post Oral Arg. Subm., Tab 3 at 10 (supplementary producer's questionnaire response, List 2, Doc. 301.53). Thus these matters do not undermine the substantial evidence supporting the Commission's determinations regarding niche products.

b. *Price effects:*

i. Findings of price suppression and depression:

Joint respondents contend that the Commission's determination with regard to price suppression and depression is not based upon substantial evidence. As with volume effects, respondents assert that the Commission made market segmentation findings and relied upon them, thus it was required to undertake a segmented analysis. Further, respondents maintain that the Commission's conclusions cannot be linked to evidence in the record, and that the Commission failed to perform a detailed trend analysis for price data. Defendant responds that the respondents are misportraying the Commission's findings, and that the Commission's findings are traceable to evidence of trends and underlying data.

As discussed previously, the court does not find that the Commission made the market segmentation findings respondents allege. *See* discussion, *supra,* at pp. 42–45. In its analysis of price effects, the Commission stated that for quarterly periods it had closely examined the relative price movements of domestic products and cumulated imports for commercial grade products. *Final Det.* at 191. The Commission found that there were "discernible patterns of price movements throughout the pe-

---

The court notes that the questionnaire information lists tonnage of corrosion-resistant product manufactured, but not exact quantities of product 45. *See id.* The court also notes that the producer at issue of product 45 was not a petitioning company, but petitioners supplied a questionnaire to the producer. Tr. at 217. The producer did not have time to complete the product specific portions of the questionnaire because it was difficult to allocate this information. *Id.*

The court finds that the effect of this omission is minor and does not require further investigation. The data pertains only to 1992, and the potential quantity produced at best would not exceed 115,000 tons. While this quantity is not small, its addition would not change significantly the fact that the majority of imports overall occurred in product categories, including niche products, where domestic products were available. In addition, the court cannot assume that all of the 115,000 tons would be in the product 45 category.

riod of investigation which show price suppression and/or price depression in a significant number of instances." *Id.* Citing to Appendix N of the Staff Report, the Commission noted that most import prices trended downward, as did domestic prices, but that import prices fell at a greater rate overall than domestic product in a substantial number of instances. *Id.* at 191 & n.237. It was upon this basis that the Commission reached its finding of a pattern of price suppression.

With regard to a trend analysis for price data, respondents' assertions, that without explanation the Commission merely cited to *"raw data"* in the Staff Report, are incorrect and are belied by the record. In its analysis of price effects, the Commission refers to Appendix N. Contained in this appendix are data for each industry indicating aggregate quarterly pricing, quantity and overselling/underselling information by country. *See* Conf. Staff Rpt. at N–2–N–64 tbls. N–1–N–66. Within each industry, the data is broken into channels of distribution for several selected product categories. *Id.* As the data are generated from questionnaire responses received by the Commission, data from producers/importers are charted separately from data received from purchasers. *Id.* In all instances for the corrosion-resistant product data contained in Appendix N, the Commission analyzed apparent trends by using chart summaries and graphs. *See* Def.'s App. to Mem. Opp'n Pls.' Mot. J. Agency R., vol. 2, List 2, Doc. 301 I (charts and graphs of cumulated data classified by distribution channel for each Commissioner). The court finds that these charts and graphs correlate almost exactly to the data contained in Appendix N, and demonstrate observable trends that were included in the majority's determination.[28]

Joint respondents' further contention is that the Commission was required to perform a traditional analysis of the percentage change in domestic and import prices between the first and last quarters of the period of investigation. As previously noted, in its review of trends in pricing data, the Commission observed that imported prices declined at a greater rate than did domestic prices in many instances. *Final Det.* at 191. Contrary to respondents' assertions, the Commission's analysis and discussion resembles its approach in other determinations. *See, e.g., Ferrosilicon from Egypt,* Inv. No. 731–TA–642, USITC Pub. No. 2688, at II–67–II–69 (Oct. 1993) (final) (showing graph of net weighted-average f.o.b. selling prices of domestic and imported products); *Ferrosilicon from Russia and Venezuela,* Inv. Nos. 303–TA–23, 731–TA–568 and 570, USITC Pub. No. 2650, at 35–38 (June 1993) (final) (observing that U.S. selling price of domestic and imported product generally fell during period and import prices declined at somewhat higher rates than domestic prices). Moreover, the Commission is afforded discretion in its analysis of price underselling. *Trent Tube Div. v. United States,* 14 CIT 386, 403, 741 F. Supp. 921, 935 (1990) (finding within ITC discretion to interpret

---

[28] In only a few instances were there variances, most quite small, in the data charted as compared with the data in Appendix N. The same is true for the graphs of this data.

reasonably evidence and determine overall significance of any factor in analysis). Thus, the court upholds the Commission's method of analysis of trends in the pricing data.

ii. Evidence of underselling:

Joint respondents assert that the Commission erred in its finding that underselling was significant, because the finding was based upon sales made in the distributor/service center channel of distribution. Respondents contend that this portion of the market is small and unrepresentative, with sporadic sales at low volumes. Respondents insist that the majority of sales by volume were in the manufacturer/end-user channel, where overselling dominated. Defendant argues that the Commission has discretion to analyze the significance of pricing data, and its decision to focus on a sector of the market where price effects would be more discernible was a reasonable one.

The Commission found a mixed pattern of overselling and underselling, with instances of overall overselling. *Final Det.* at 190. The Commission determined that underselling dominated in the distribution/service center channel. *Id.* The Commission acknowledged that shipments in the distributor/service center channel accounted for a smaller percentage of total U.S. shipments. *Id.* at 169 n.46. The Commission noted that in 1992 22 percent of U.S. merchant shipments, and approximately 30 percent of all import shipments, occurred in this channel of distribution. *Id.* The Commission found sales in this channel to show more readily discernible price effects, because purchasers with the most rigorous qualification requirements did not purchase through this channel. *Id.* at 190. Prices in this channel were usually negotiated on a spot or by-order basis. Pub. Staff Rpt. at I–152. In contrast, in the manufacturer/end user channel, prices are based upon long-term contracts negotiated at different times for periods as long as three years. *See id.* at I–151–I–152. Thus the Commission reasonably concluded that changes in price in the distributor/service center channel as reflected in quarterly comparisons would show movements in the market.

At oral argument, respondents introduced charts indicating the size of each channel of distribution, by volume, value and number of instances of price comparisons, as well as the volume of imports oversold and undersold in each channel. *See* Jt. Pls.' Post-Oral Arg. Subm., Tab 1, Exs. O, P. Petitioners also presented charts indicating the percentage by volume of underselling and overselling by imports, for each channel. *See* Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R. at Fig. 1. As depicted by petitioners, in the manufacturer/end user market overselling predominated, and in the distributor/service center channel, underselling occurred for more than 90 percent of the imports. Petitioners also noted that while total volume of imported and domestic sales is lower in the distributor/service center channel, on a product-by-product basis, the results vary. *See* Conf. Staff Rpt. at App. N. The court finds the Commis-

sion's analysis as based upon the distributor/service center channel was within the ITC's discretion in analyzing price undercutting.

iii. Deep discounting theory:

The Commission found that although corrosion-resistant steel was relatively price insensitive, this fact did not lead to the conclusion that the price of dumped imports have had no effect. *Final Det.* at 189. The Commission characterized the domestic industry as attempting to "catch-up" with imports, trying to expand shipments to use recent additional capacity. *Id.* As offering competitive prices likely would have no effect, given the level of price insensitivity in the market, the Commission found that deep discounting from prices of dumped and subsidized imports was the only avenue that would permit domestic producers to capture market share in certain segments of the market. *Id.* Thus, the Commission placed less weight upon evidence of overselling in those segments. *Id.*

Joint respondents find that the Commission's deep discounting theory is flawed in many respects, as it is contrary to the Commission's prior methodology, it is unsupported by the evidence, and it does not comport with data in the market segments respondents contend the Commission found. Defendant and petitioners counter that evidence on the record supports a finding of deep discounting.

Evidence of deep discounting is in the form of affidavits of officers and sales managers of U.S. steel producers that recount instances where, in negotiations with purchasers, U.S. producers were told to offer prices at or below import price levels. *See* App. to Def.-Ints.' Mem. Opp'n to Pls.' Mots. J. Agency R., Tab 13B, Exs. 16–17, Ex. 18 at ¶¶ 3–4 (affidavits of managers employed with U.S. steel producers). Additional evidence includes purchaser questionnaire responses. *See* App. to Def.-Ints.' Mem. Opp'n Pls.' Mots. J. Agency R., Tab 21, List 2, Admin. Docs. 301.274 & 301.303, at Question III.D.7. Although certain affidavits lack specific dates in some instances, in general they demonstrate conversations with identified purchasers concerning sales negotiations, where purchasers have requested a lower price in comparison with import prices. The court finds that, contrary to respondents' view, instances of negotiation, where the domestic industry did not receive the sale, is circumstantial evidence that deep discounting was necessary for competitive purposes.

Respondents also take exception to affidavits from U.S. producers who merely renovated or upgraded their corrosion-resistant production facilities, but did not recently build new facilities with added capacity. *See* App. to Def.-Ints.' Mem. Opp'n to Pls.' Mots. J. Agency R., Tab 13B, Ex. 20, at ¶¶ 3–4 (aff. from sales officer of U.S. steel producer); Pls.' Post-Oral Arg. Subm., Tab 1, Ex. A at ¶¶ A.2., B.2., H.2. (individual challenges to deep discounting evidence). Respondents reason that if no new capacity was added, then the U.S. producer was not trying to "catch up" to imports. The court is not persuaded by this argument, as it is possible to

upgrade facilities to be able to make certain specialized corrosion-resistant products, without investing in new facilities, and the record indicates unused capacity existed.

Respondents have also found several affidavits and a questionnaire response to be flawed because they refer to instances where certain U.S. producers have failed to qualify to sell their products to the purchaser. Pls.' Post-Oral Arg. Subm., Tab 1, Ex. A at ¶¶ A.2., C.2., D.2., F.2, G.2. (individual challenges to deep discounting evidence). Thus, respondents claim that as a practical matter, these producers were not able to compete for the sale. Clearly, petitioners' inability to meet buyer qualifications for certain products during the period of investigation would prevent petitioners from competing for the sale, at any price. Although these particular instances do not support that deep discounting occurred, the court finds that this flaw as to lack of qualification affects only a minority of the deep discounting evidence contained in the affidavits.

While the Commission took into account respondents' assertions that for certain specialized products purchasers preferred imports, the record supports the view that domestic producers for the most part competed for these sales. Once purchasers have an established supply relationship, the established supplier has an advantage, and the competing supplier is forced to beat the import price, probably by a substantial margin. Thus, evidence of overselling does not eliminate the likelihood that deep discounting was necessary to be able to compete in certain segments. *Cf. Maine Potato Council v. United States,* 9 CIT 293, 301–02, 613 F. Supp. 1237, 1245–46 (1985) (finding imports sold at higher price insufficient to establish imports not causing price suppression/depression as other relevant factors must be considered).

Respondents' remaining challenges as they relate to methodology and market segment data are unavailing. The Commission took into account the types of competitive factors that it traditionally incorporates in its analysis of price effects. Additionally, the court finds that respondents' arguments regarding specific product pricing data, to the extent they rely upon the view that the product market must be viewed as segmented in a particular way for purposes of this analysis, do not succeed. The court notes that although certain pricing data for individual pricing products do not show evidence of deep discounting, as respondents argue, this is not dispositive, because negotiations for price as evidenced in affidavits in the record will not be reflected in such data. Thus, the court concludes that the Commission's finding as to the presence of deep discounting was supported by substantial evidence.

c. *Impact of imports on capital expenditures:*

Joint respondents argue that the majority, in its present injury causation analysis, and Commissioner Newquist, in his finding of threat of material injury, improperly made the assumption that the decline in capital expenditures in the industry was due to the impact of imports.

Joint respondents also contend that the Commission ignored evidence of significant increases in domestic capacity. In opposition, defendant and petitioners maintain that the Commission's conclusions were reasonable based upon the evidence.

The Commission determined that the domestic industry continued to lose market share to increasing volumes of imports even though it had positioned itself to respond to increased demand. *Final Det.* at 191. The Commission also concluded that as a result, capital expenditures and research and development declined, especially later in the period, and undermined attempts by the corrosion-resistant steel industry to respond to new demands. *Id.* The Commission further found industry profitability later in the period to be lower than it was in 1990. *Id.* The Commission also looked at the effect of the economic downturn on the industry, finding that 1991 declines in apparent U.S. consumption suggested the corrosion-resistant market was impacted by the downturn. *Id.* at 192.

The court finds that the Commission, including Commissioner Newquist, reached a conclusion supported by the evidence. Capital expenditures and research and development expenditures declined substantially from 1990 to 1992. *Id.* at 171; Pub. Staff Rpt. at I–84 tbl. 41, I–86 tbl. 43. While respondents argue that declines in investment in 1992 were the result of earlier investment decisions to expand capacity that were completed by 1992, the Commission found that earlier investment decisions to fund new capacity were thwarted by increased market penetration by subject imports. *Final Det.* at 191–92.

Specifically, one domestic producer cancelled several upgrade projects of substantial value over the period of investigation on the basis of price suppression caused by imported products that had left the producer's cash flows lower. *See* Conf. Staff Rpt. at G–7. Other producers similarly indicated in questionnaire responses that they had cancelled or indefinitely delayed capital investments in upstream production upgrades that would have benefitted corrosion-resistant steel production. *See* App. to Def.-Ints.' Mem. Opp'n to Pls.' Mots. J. Agency R., Tab 22, List 2, Admin. Docs. 301.11, 301.12, 301.35, 301.36, at Question IV.H.1 (producer's questionnaire responses). Further, data regarding the income and loss experience of domestic producers indicates that although the industry profitability recovered somewhat from losses in 1991, the industry did not approach the level of profitability it experienced in 1990. *See* Pub. Staff Rpt. at I–83 tbl. 40. This evidence supports the Commission's finding that the decline in capital expenditures was related to the impact of imports. Respondents have not established that the Commission's conclusions were unsupported by substantial evidence.

## C. THREAT OF MATERIAL INJURY

Pursuant to 19 U.S.C. § 1677(7)(F)(ii), the Commission is directed to consider whether a U.S. industry is threatened with material injury by reason of the subject imports "on the basis of evidence that the threat of material injury is real and that actual injury is imminent." *Id.* The Com-

mission is to consider, among other relevant factors, a list of factors including: 1/ if a subsidy is involved, 2/ any increase in production capacity or existing unused capacity, 3/ any rapid increase in U.S. market penetration, 4/ the probability that imports will enter the U.S. at prices that will have a depressing or suppressing effect, 5/ any substantial increase in U.S. inventories, 6/ the presence of underutilized capacity, 7/ any other demonstrable adverse trends, 8/ the potential for product-shifting, and 9/ the actual and potential negative effects on the existing development and production efforts of the domestic industry. *Id.* § 1677(7)(F)(i).

## 1. *Mexico:*

Petitioners argue that the majority's negative threat finding was based upon weak evidence, particularly "self-serving" 1993 data from Mexican respondents regarding export and capacity projections. Defendant and respondent IMSA maintain that the Commission weighed all of the evidence on the record, and that there was not substantial evidence to support a finding of threat.

The majority of the Commission concluded that imports of corrosion-resistant steel from Mexico were not likely to suppress or depress prices of domestic steel, that Mexican inventories did not support a threat finding, and that Mexican imports were not likely to increase to injurious levels. *Final Det.* at 197. To support this view, the majority relied upon data that showed a lack of a rapid increase in market penetration by Mexican imports, that market penetration was negligible, that Mexican inventory volumes were small as compared with total Mexican shipments, and that an increase in third country exports was expected. *Id.* at 196–97; Conf. Staff Rpt. at I–203 tbl. 82; Pub. Staff Rpt. at I–149 tbl. 107.

Petitioners argue that other evidence indicates that Mexican imports did pose a threat. Petitioners refer to the increase in Mexican capacity over the period of investigation while capacity utilization declined, and the near doubling of capacity in 1992 reported by one Mexican producer. *See* Conf. Staff Rpt. at I–203 tbl. 82, I–204; App. to Pet'rs' Mot. J. Agency R., Tab 8, at 6. Petitioners also rely upon data demonstrating a significant increase in end-of-period inventories held by Mexican importers, the increase in exports to the United States while third country imports declined, as well as the fact that the United States was the most significant export market for Mexico during the period of investigation. *See* Conf. Staff Rpt. at I–137 tbl. 48, I–203 tbl. 82. According to petitioners, these trends lead to the conclusion that the Mexican excess capacity would likely be directed at the U.S. market.

Defendant argues that although there was increased capacity between 1991 and 1992, this increase is not relevant, because during that time Mexican exports to the United States did not increase significantly. Petitioners counter that the record does not support this assertion, because during the 1991–92 period, Mexican capacity increased nearly 25 percent while Mexican exports increased more than one-third. Conf.

Staff Rpt. at I–203 tbl. 82. Petitioners note that at the same time, Mexican shipments to the United States represented an increased percentage of total shipments. *Id.*

Defendant argues that petitioners are portraying only the latter portion of the investigation period, and that overall there was not an increase. Defendant also indicated that petitioners' depiction of one Mexican producer's data was in fact distorted; while one Mexican producer's capacity doubled in 1992, the tonnage involved was small, and the producer's home market shipments had increased even more significantly. *See* App. to Pet'rs' Mot. J. Agency R., Tab 8, at 6.

Although petitioners point to various data in the record to counter data relied upon by the Commission, in reaching a threat determination, the Commission is afforded discretion in interpreting the data and the court does not weigh the evidence. *Bando Chem. Indus., Ltd. v. United States,* 16 CIT 133, 136, 787 F. Supp. 224, 226 (1992), *aff'd,* 26 F.3d 139 (Fed. Cir. 1994). Data for Mexican imports shows that although there were increases in capacity, market share, and volume of U.S. imports in the 1991–92 period, over the entire period of investigation the data showed a slight decline in import volume. *See* Conf. Staff Rpt. at I–203 tbl. 82; Pub. Staff Rpt. at I–139 tbl. 96. While the court notes that the Commission did not cite to Table 96 in its determination, the Commission found that a significant increase in import volume was not likely—a reasonable conclusion in light of the evidence. Accordingly, the court finds that the negative threat determination for Mexico is substantially supported.

### 2. *Brazil:*

Petitioners raise the same objection to the majority's negative threat determination for Brazilian imports as they did for Mexican imports, alleging that the Commission relied mostly on respondents' "self-serving" 1993 projections for imports to the United States and ignored evidence of potential increase in Brazilian import volume, weak home market and third country demand, underutilized capacity, and the addition of substantial new capacity by one producer, in reaching its conclusion.

Defendant counters that the Commission's determination did not turn upon respondents' projections, and that the fact that capacity increased, without more, does not support a threat finding. Defendant also argues that within the context of other trends, the presence of underutilized capacity does not demonstrate increased production would be diverted to the U.S. market. Respondent Companhia Siderúrgica Nacional S.A. ("CSN") maintains that the increased capacity anticipated for the latter half of 1993 consisted of product that would not compete with CSN's product. Specifically, CSN indicated that the new capacity added by another Brazilian producer was in response to discussions with Brazilian automakers concerning domestic market needs, and this producer had not manufactured this product previously. Tr. at 292–93. Further, the new capacity would be available for a more expensive pro-

cess and a product made for use in external automotive products and household appliances. *See* App. to CSN's Mem. Opp'n Pet'rs' Mot. J. Agency R., Ex. 6, at 7–8 (excerpt of Post-Hrg. Br. of CSN). This product also would be subject to testing and qualification requirements to meet buyer specifications. Tr. at 292–93. In contrast, CSN's product is sold for applications such as construction, piping, air conditioning internal parts, and internal automotive parts. Therefore, the added capacity likely would not force CSN to export to other markets. App. to CSN's Mem. Opp'n Pet'rs' Mot. J. Agency R., Tab 6, at 7. CSN also explained that its own increase in capacity utilization over the period, despite declining shipments to the United States, was due to rising demand in Brazil. *See id.,* Tab 3, at 9 (CSN questionnaire response); Tr. at 293.

The Commission found that Brazilian capacity had remained unchanged during the period, and that capacity utilization had increased overall. *Final Det.* at 195. The Commission also found that Brazilian import volume was small and had declined during the period. *Id.* The Commission further found that the level of imports was negligible, market penetration had not increased, and no persuasive evidence suggested that these trends would change. *Id.* Based upon these facts, the court determines that there was substantial evidence to support the finding that Brazilian imports did not pose a threat of material injury. Although petitioners have demonstrated evidence of increased capacity, the mere fact that production may increase does not warrant a threat finding. *See Hannibal Indus., Inc. v. United States,* 13 CIT 202, 209, 710 F. Supp. 332, 337–38 (1989). "A Commission finding that levels of imports will increase must be based on positive evidence tending to show an intention to increase the levels of importation." *Id.* at 209, 710 F. Supp. at 338 (citations omitted). Here, other evidence indicates that this increase in capacity will likely be directed to the home and third markets. Thus, the Commission's finding as to Brazil is sustained.[29]

## CONCLUSION

The joint respondents have failed to demonstrate error in the ITC's present injury determination, except with regard to Mexico. Commissioner Watson's cumulation analysis as to Mexico is flawed and is remanded for reconsideration. No other significant errors were demonstrated.

---

[29] Respondent Usinor challenges Commissioner Rohr's affirmative threat finding as to France. As the court upholds the affirmative finding of present material injury, it does not address this contention.